**PUBLIC COPY – SEALED MATERIAL DELETED**

NOT YET SCHEDULED FOR ORAL ARGUMENT

---

No. 19-7117

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

FADI ELSALAMEEN,
Appellant,
v.
BANK OF PALESTINE, P.L.C.,
Appellee.

---

On appeal from orders entered in the United States District Court
For the District of Columbia
(No. 16-cv-1976 (ABJ))
The Hon. Amy Berman Jackson

---

# BRIEF FOR APPELLANT

---

William D. Blakely, Esq.
WILLIAM BLAKELY LAW
P.O. Box 271
Great Falls, VA 22066
Telephone: (202) 285-2728
wblakely@williamblakelylaw.com

Cathy A. Hinger, Esq.
WOMBLE BOND DICKINSON (US) LLP
1200 Nineteenth Street, NW, Suite 500
Washington, DC 20036
Telephone: (202) 857-4489
cathy.hinger@wbd-us.com

Counsel for Appellant

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I. Parties, Intervenors and Amici Curiae

Appellant/Plaintiff: Fadi Elsalameen

Appellee/Defendant: Bank of Palestine, P.L.C.

There were no amici or intervenors before the United States District Court for the District of Columbia ("District Court"), and Appellant does not anticipate any will appear before this Court.

### II. Rulings Under Review

Appellant seeks review of the Hon. Amy Berman Jackson's Order entered on September 4, 2019, granting Appellee's motion to dismiss the Second Amended Complaint with prejudice, Joint Appendix ("JA") 881, and the accompanying Memorandum Opinion of the same date, JA868-80, (collectively, the "Dismissal Order"). Appellant also seeks review of Judge Jackson's Minute Order entered on November 27, 2018, granting in part, and denying in part, limited jurisdictional discovery (the "Discovery Order"). JA5-6.

### III. Related Cases

This case has not previously been appealed to this Court. Appellant is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

PAGE

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

I. Parties, Intervenors and Amici Curiae ........................................................ i

II. Rulings Under Review ........................................................................ i

III. Related Cases ............................................................................... i

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES.........................................................................2

STATUTES AND REGULATIONS......................................................................4

STATEMENT OF THE CASE............................................................................5

Factual Background ........................................................................................5

A. Fadi Elsalameen ........................................................................................5

B. The Bank ...................................................................................................7

1. District Of Columbia Customers And Account Activity .....................7

2. The Bank's Interactive Website...........................................................9

3. The Bank's District Of Columbia Shareholders................................10

4. The Bank's Solicitation Of Capital Investments In The District Of Columbia .......... 11

5. Other Business Trips To The District Of Columbia .......... 14

6. Emails And Investor Relations List .......... 15

Procedural History .......... 16

SUMMARY OF THE ARGUMENT .......... 18

ARGUMENT .......... 21

I. The Standard Of Review Applicable To This Appeal .......... 21

II. The District Court Erred When It Dismissed The Second Amended Complaint For Lack Of Personal Jurisdiction .......... 22

A. The District Court Has Specific Jurisdiction Under D.C.'s Long-Arm Statute .......... 22

B. The District Court Erred In Failing To Consider The Totality Of The Bank's Contacts With The District of Columbia .......... 27

C. The District Court Abused Its Discretion By Denying Jurisdictional Discovery Into, And Then Erred In Failing To Consider In Its Dismissal Order, The Bank's Contacts With Governmental Agencies Or Arms Of The World Bank, Including The IFC .......... 36

1. The Government Contacts Exception Does Not Apply To A Nonresident Alien's Contacts With The United States Government ....................37

2. The Government Contacts Exception Is Limited To Contacts For The Purpose Of Exercising The First Amendment Right To Petition The United States Government, And Does Not Extend To Commercial Contacts ....................42

3. The District Court Erred In Not Considering The Commercial Nature Of The Bank's Contacts With The District of Columbia, Including The IFC's Significant Equity Ownership In The Bank ....................47

D. The District Court's Evaluation Of The Bank's Revenues Related To In-Forum Contacts Was Flawed ....................48

III. Any Factual Issues Should Be Resolved Through Jurisdictional Discovery ....................50

CONCLUSION ....................52

CERTIFICATE OF COMPLIANCE ....................

CERTIFICATE OF SERVICE ....................

# TABLE OF AUTHORITIES


**CASES** **PAGE**

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
346 F. Supp. 2d 64 (D.D.C. 2004)........................................................ 44, 45, 46

*Akhmetshin v. Browder*,
407 F. Supp. 3d 11 (D.D.C. 2019)................................................................ 38, 41

*Al Maqaleh v. Hagel*,
738 F.3d 312 (D.C. Cir. 2013)..................................................................... 50, 51

*Am. Standard, Inc. v. Sanitary Wares Mfg. Corp.*,
No. 86-cv-1997, 1987 WL 19224 (D.D.C. June 30, 1987).................................38

*Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*,
578 F. Supp. 2d 164 (D.D.C. 2008) ........................................................... 30, 31

*Bluman v. Fed. Election Comm'n*,
800 F. Supp. 2d 281 (D.D.C. 2011) ..................................................................41

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998).................................................. 23, 24, 28, 29, 31

*Burman v. Phoenix Worldwide Industries, Inc.*,
437 F. Supp. 2d 142 (D.D.C. 2006) ..................................................................28

*Campanhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*,
35 A.3d 1127 (D.C. 2012) ........................................................................... 40, 42

*Charlton v. Mond*,
987 A.2d 436 (D.C. 2010) .................................................................................29

*Crane v. Carr*,
814 F.2d 758 (D.C. Cir. 1987)..................................................................... 24, 27

*Crane v. N.Y. Zoological Soc'y*,
894 F.2d 454 (D.C. Cir. 1990)..................................................................... 22, 34

*D'Onofrio v. SFX Sports Group, Inc.*,
534 F. Supp. 2d 86 (D.D.C. 2008)....................24

*Dooley v. United Technologies Corp.*,
786 F. Supp. 65 (D.D.C. 1992)....................44

*Envt'l Research International v. Lockwood Greene Engineers, Inc.*,
355 A.2d 808 (D.C. 1976) .................... 37, 38

*Etchebarne-Boudin v. Radice*,
982 A.2d 752 (D.C. 2009) .................... 19, 28

*FC Inv. Group LC v. IFX Markets, Ltd.*,
529 F.3d 1087 (D.C. Cir. 2008).................... 24, 25, 44

*Foley v. Connelie*,
435 U.S. 291 (1978) ....................41

*Founding Church of Scientology of Washington, D.C. v. Verlag*,
536 F.2d 429 (D.C. Cir. 2008)....................35

*FutureGen Co. v. Carter*,
915 F. Supp. 2d 104 (D.D.C. 2013) ....................27

*Gorman v. Ameritrade Holding Corp.*,
293 F.3d 506 (D.C. Cir. 2002).................... 25, 31

*Groop Internet Platform Inc. v. Psychotherapy Action Network*,
Slip Op. 19-cv-1854, 2020 WL 353861 (D.D.C. Jan. 21, 2020) .................... 22, 23

*GTE New Media Servs., Inc. v. Bellsouth Corp.*,
199 F.3d 1342 (D.C. Cir. 2000)....................22

*Harris v. Omelon*,
985 A.2d 1103 (D.C. 2009) .................... 19, 26, 28, 36

*Investment Co. Institute v. United States*,
550 F. Supp. 1213 (D.D.C. 1982).................... 20, 42, 43

*Jam v. Int'l Finance Corp.*,
139 S. Ct. 759 (2019)....................46

*Khatib v. Alliance Bankshares Corp.*,
846 F. Supp. 2d 18 (D.D.C. 2012)....................48

*Kopff v. Battaglia*,
425 F. Supp. 2d 76 (D.D.C. 2006)....................24

*Leitner-Wise v. Clark*,
No. 18-771, 2018 WL 6787999 (D.D.C. Dec. 26, 2018)....................48

*Lewy v. Southern Poverty Law Center, Inc.*,
723 F. Supp. 2d 116 (D.D.C. 2010) .................... 23, 27, 31

*Lex Tex Ltd., Inc. v. Skillman*,
579 A.2d 244 (D.C. 1990) .................... 38, 39

*Livnat v. Palestinian Authority*,
851 F.3d 45 (D.C. Cir. 2017)....................21

*Morgan v. Richmond Sch. of Health & Tech., Inc.*,
857 F. Supp. 2d 104 (D.D.C. 2012) .................... 20, 43

*Mouzavires v. Baxter*,
434 A.2d 988 (D.C. 1981) .................... 19, 26, 28

*Murphy v. Islamic Rep. of Iran*,
740 F. Supp. 2d 51 (D.D.C. 2010)....................40

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005)....................22

*Naegele v. Albers*,
110 F. Supp. 3d 126 (D.D.C. 2015) ....................32

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ....................42

*Nuevos Destinos, LLC v. Peck*,
No. 15-cv-1846, 2019 WL 78780 (D.D.C. Jan. 2, 2019)....................32

*Palestine Info. Office v. Schultz*,
853 F.2d 932 (D.C. Cir. 1988)....................40

*Parsons v. Mains*,
580 A.2d 1329 (D.C. 1990) .......................................................................... 28, 36

*Ramamurti v. Rolls-Royce Ltd.*,
454 F. Supp. 407 (D.D.C. 1978)............................................................ 39, 43, 45

*Richards v. Duke Univ.*,
480 F. Supp. 2d 222 (D.D.C. 2007) ...................................................................28

*Rose v. Silver*,
394 A.2d 1368 (D.C. 1978) .................................................. 19, 20, 37, 38, 39, 45

*Shaheen v. Smith*,
994 F. Supp. 2d 77 (D.D.C. 2013)......................................................................31

*Simon v. Rep. of Hungary*,
37 F. Supp. 3d 381 (D.D.C. 2014)............................................................... 28, 29

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*,
647 F.2d 200 (D.C. Cir. 1981).................................................................... 40, 41

*Steinberg v. Int'l Crim. Police Org.*,
672 F.2d 927 (D.C. Cir. 1981)............................................................................23

*Sugarman v. Dougall*,
413 U.S. 634 (1973) ...........................................................................................41

*Trump v. Comm. on Ways and Means, U.S. House of Reps.*,
--- F. Supp. 3d ---, 2019 WL 5866752 (D.D.C. 2019) ................................. 24, 27

*World Wide Minerals Ltd. v. Rep. of Kazakhstahn*,
116 F. Supp. 2d 98 (D.D.C. 2000).......................................................................43

# JURISDICTIONAL STATEMENT

The District Court's jurisdiction is pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Appellant is a citizen of the United States and was a resident of the District of Columbia when he filed the underlying action and all times relevant to his claims, and Appellee is a public limited company headquartered in Palestine and organized under the laws of Palestine.

This Court's jurisdiction is pursuant to 28 U.S.C. § 1291, which grants the courts of appeal jurisdiction over all final orders of the district courts of the United States.

The District Court dismissed the Second Amended Complaint with prejudice for lack of personal jurisdiction on September 4, 2019. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B), Appellant timely filed his notice of appeal of the Court's September 4, 2019 Order, and its Order dated November 27, 2018 regarding the scope of jurisdictional discovery, on September 20, 2019.

## STATEMENT OF THE ISSUES

1. Did the District Court err in dismissing with prejudice the Second Amended Complaint for lack of specific personal jurisdiction over the Bank of Palestine, P.L.C. ("Bank") under D.C.'s long-arm statute, D.C. Code § 13-423(a)(4)?

2. Did the District Court err in not considering the totality of the Bank's contacts with the District of Columbia when it held that Fadi Elsalameen ("Mr. Elsalameen") failed to make a *prima facie* showing of specific jurisdiction under D.C.'s long-arm statute, D.C. Code § 13-423(a)(4)?

3. Did the District Court err in excluding the Bank's contacts with Mr. Elsalameen, a resident of the District of Columbia at all times relevant?

4. Did the District Court err in holding that the Government Contacts Exception applies to the Bank, a foreign company organized under the laws of Palestine and a citizen of Palestine, thereby impliedly recognizing that foreign entities have a First Amendment right to petition the United States Government?

5. Did the District Court err in limiting jurisdictional discovery by excluding the Bank's contacts with any governmental entities or arms of the World Bank, including the International Finance Corporation ("IFC"), by expressly holding that such contacts with the IFC are exempted as a government contact?

6. Did the District Court err in not considering that the IFC's 4.73% equity ownership in the Bank constitutes a persistent course of conduct in the District of Columbia?

7. Did the District Court abuse its discretion in denying jurisdictional discovery into the Bank's contacts with the IFC, which is an international organization headquartered in the District of Columbia, one of the Bank's major shareholders with a 4.73% equity interest, and voting rights equal to its equity ownership percentage, is responsible for developing the Bank's risk management program, and serves as an independent member of the Bank's Board of Directors?

8. Did the District Court err in overstating the Bank's revenue when it included the revenues of the Bank's subsidiaries?

## STATUTES AND REGULATIONS

In relevant part, D.C. Code § 13-423(a)(4) provides:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . (4) causing tortious injury in the District of Columbia by an act or omission outside of the District of Columbia if he regularly does or solicits business, engages in any persistent course of conduct, or derives substantial revenue from goods used or consumed, or servicers rendered, in the District of Columbia.

# STATEMENT OF THE CASE

This is an appeal of the dismissal of an action for defamation, conspiracy to defame, invasion of privacy, tortious interference with contract, fraud, civil conspiracy, and intentional infliction of emotional distress brought by Fadi Elsalameen against the Bank of Palestine, P.L.C. Mr. Elsalameen also appeals the District Court's order granting in part, and denying in part, jurisdictional discovery.

## Factual Background

### A. Fadi Elsalameen.

Mr. Elsalameen is a dual U.S.-Israeli citizen of Palestinian descent, who at the time of the incidents that are the subject of this lawsuit was a resident of the District of Columbia. JA132-33 ¶¶ 3-4. After settling permanently in the United States in 2011, Mr. Elsalameen began a career in international investment and development. JA133-34 ¶ 9. Simultaneously, he began to publish information on the internet and to otherwise speak out about corrupt and unjust practices of Palestinian government officials and institutions. *Id.*

The Bank engaged in a prolonged, calculated effort to discredit, threaten, extort, and silence Mr. Elsalameen due to his public criticism of the Palestinian regime and powerful Palestinian institutions and individuals. JA138 ¶¶ 35-38. As part of its scheme, the Bank, *inter alia*, defamed Mr. Elsalameen, invaded his

privacy, tortiously interfered with a valid contractual relationship, and intentionally inflicted severe emotional distress. JA141-42 ¶¶ 52-54; JA144-45 ¶¶ 64-70; JA148-57 ¶¶ 85-100.

The genesis of Mr. Elsalameen's complaint stems from his refusal to pay a bribe to an employee of the Bank, where Mr. Elsalameen had opened an account with a deposit of $2 million on behalf of an entity he formed with his aunt. JA142-43 ¶¶ 55-59. Thereafter, the Bank demanded that Mr. Elsalameen turn over sensitive personal information. JA144-45 ¶¶ 64-70. The Bank released this information to the Palestinian National Authority, which induced the publication of a false and defamatory story that Mr. Elsalameen intended to use the funds in his account to purchase and then transfer real estate in Jerusalem to an Israeli citizen, a crime punishable by death under Palestinian law. JA147-48 ¶ 81.

During this period, Mr. Elsalameen lived and worked in the District of Columbia, a fact known to the Bank. JA157-58 ¶¶ 101-04. The Bank's actions were targeted to cause Mr. Elsalameen to suffer harm to his reputation in the District of Columbia. JA136-37 ¶¶ 21-24. He did suffer harm here, including death threats, physical surveillance of his District of Columbia home, and damage to his reputation and standing in the business community. JA136-37 ¶¶ 21-24; JA159 ¶¶ 108, 110.

### B. The Bank.

The Bank is organized under the laws of the Palestinian National Authority. JA134 ¶ 12. Its headquarters and principal place of business is in Ramallah in the West Bank. *Id.* Over the three-year period from 2015 through 2017, the Bank reported gross income of $535,206,456 and Net Interest & Commission Revenue of $447,572,908. JA735. The $447,572,908 figure includes the revenues of the Bank's subsidiaries. JA735; JA238-39.

#### 1. District Of Columbia Customers And Account Activity.

The Bank has regularly engaged in substantial business with banking customers located in the District of Columbia. JA134-36 ¶¶ 13-20. Since January 1, 2015,[1] the Bank executed hundreds of transactions on behalf of four corporate accounts with entities that provided an address in the District of Columbia as the contact or place of business, that are headquartered or have a principal place of business in the District of Columbia, or are incorporated in the District of Columbia. JA182-83; JA189.[2] In total, these transactions involved over $40 million in aggregate value, including $23.1 million in transfers and $7.2 million in

[1] Mr. Elsalameen was limited to taking jurisdictional discovery for the period January 1, 2015 to "the present." JA5.

[2] The Bank did not disclose the identities of those customers in its jurisdictional discovery responses, and referred to them as Customer A, B, C, and D. JA182-83; JA189.

withdrawals. JA189. The Bank's District of Columbia customers also deposited $15.01 million into their accounts. *Id.* In aggregate, these four customer accounts possessed an average monthly balance of $1,528,449. *Id.* More specifically, since January 1, 2015, the Bank's District of Columbia customers:

- initiated 722 transactions;
- made 88 separate transfers to and from the United States for a total transfer volume of $23,149,894;
- engaged in 58 credit transactions with the Bank with a total volume of $15,058,643;
- made 576 separate withdrawal transactions; and
- withdrew funds totaling $7,208,350 from the Bank.

*Id.* The Bank charged these District of Columbia customers $6,685 in "Fees Charged." *Id.* This figure, however, does not include the revenue passing to the Bank in the form of net interest gained through these District of Columbia accounts. *Id.* That amount was not disclosed in the Bank's calculations. *Id.*

In addition to these four District of Columbia customers, the Bank has continuously maintained an account for Al Serena, an entity that Mr. Elsalameen created with his aunt. JA140 ¶¶ 43, 46. Al Serena's registered place of business is in Hebron in the West Bank, but, during the relevant time period, it primarily conducted business through its principal, Mr. Elsalameen, from the District of

Columbia. JA140 ¶ 44. Mr. Elsalameen opened Al Serena's account with the Bank in the District of Columbia, and funded it with $2 million. JA133 ¶ 4; JA140 ¶ 46.

### 2. The Bank's Interactive Website.

Since January 1, 2015, the Bank has continuously maintained an interactive website in English that provides online banking services to customers, and advertises to and solicits customers in the District of Columbia. JA135-36 ¶ 20. The interactive website can be accessed at https://www.bankofpalestine.com/en, and it advertises and promotes the Bank and its services (including accounts, credit cards, electronic banking, funds transfers, credit facilities, etc.), to customers worldwide and the District of Columbia. JA191-93.

The Bank also directed shareholders and customers to a second website https://bop.ps/en/ir, which it described as a "more dynamic Investor Relations website." JA555-58; JA573-77; JA617-20. Through this website, the Bank, *inter alia*, kept investors and fund managers aware of Bank employees' travels and passed on information relevant to its financial performance and investment opportunities. *Id.*

Both websites have a section devoted to customers and potential customers of the Palestinian diaspora community, which includes customers and potential customers in the District of Columbia, such as Mr. Elsalameen. JA191-93; JA666-67. The Bank promotes its services and solicits customers based on its internet

banking capabilities, stating, "[t]hrough internet banking [via the Bank's interactive website], clients are able to control their money and conduct transactions on their accounts around the clock without being restricted to official working hours." JA191.

The Bank's interactive website was continuously accessible, and in fact, regularly used by its District of Columbia customers. Since January 1, 2015, these customers accessed their accounts online a total of 1,739 times. JA189.

### 3. The Bank's District Of Columbia Shareholders.

Three shareholders, all located within the District of Columbia, hold or have held an equity interest in the Bank since January 1, 2015. JA185; *see also* JA596. The largest of the three is the IFC, an international organization and part of the World Bank Group, headquartered in the District of Columbia. The IFC is not an agency of the United States Government. The IFC holds a 4.73% equity interest in the Bank, making it one of the Bank's major shareholders.[3] JA596. The IFC also has an equivalent percentage of voting rights. *Id.* One of the IFC's senior employees, Nada Shousha, was appointed as an independent member of the Bank's Board of Directors. JA561-62. The IFC, over a two-year period, loaned the Bank $75 million in loan guarantees for an affordable housing initiative. JA250; JA836.

---

[3] The equity held by the other two shareholders who reside in the District of Columbia are 0.00003333% and 0.00006950%, respectively. JA185.

### 4. The Bank's Solicitation Of Capital Investments In The District Of Columbia.

The Bank also regularly solicits capital investments from investors in the District of Columbia. During jurisdictional discovery, the Bank produced seven investor presentations that were prepared for the purpose of soliciting investors during the Bank's trips to the District of Columbia. JA270; JA277-358; JA359-461; JA462-549.[4]

[4] In its written jurisdictional discovery responses, the Bank stated that, "to the best of the Bank's knowledge," these investor presentations were "never requested by or provided to any nongovernmental person in the District of Columbia." JA270. Because the District Court did not permit Mr. Elsalameen to take jurisdictional discovery of the Bank's contacts with governmental entities or arms of the World Bank (which includes the IFC), it is not known whether the Bank made investor presentations to the IFC, and if so, how many presentations were made, to whom they were made, when the presentations were made, and whether there were follow-up discussions or meetings regarding further investments.

**PUBLIC COPY – SEALED MATERIAL DELETED**

In addition, the Bank's Investor Relations Department organized a major fundraising event in the District of Columbia, attended by senior Bank officials. In its publicly filed 2016 Annual Report, the Bank disclosed that its Investor Relations Department conducted a "USA Road Show," including a two-day event in the District of Columbia on December 12-13, 2016. JA180; JA219.[5] According to this public disclosure, the Bank promoted the Road Show as a major effort of its Investor Relations Department to fundraise. *Id.* (describing how the Investor Relations Department "embarked on an active networking [campaign]" for the purpose of "developing investor relations spanning different regions of the globe").

Two of the most senior Bank officials attended the District of Columbia Road Show: Hashim Shawa, the Bank's Chairman and General Manager; and Kamel Husseini, the Bank's Chief International Relations Officer. JA180. Their itinerary reveals that, during the two-day Road Show event in the District of Columbia, [redacted]

[5] The U.S. portion of the investor Road Show included only two other cities – Houston and Minneapolis. JA219.

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

**5. Other Business Trips To The District Of Columbia.**

The Bank made other trips to the District of Columbia since January 1, 2015, to meet with non-governmental entities or individuals.[6] JA180. Hashim Shawa, the Bank's Chairman and General Manager, and Mahmoud Shawa, the Bank's Chief Risk Officer,[7] traveled to the District of Columbia on October 4-8, 2016, and met with an unidentified shareholder from Kuwait, unidentified officials of the Institute of International Finance, and unidentified "executives and employees from other financial institutions." *Id.* This trip was ostensibly for the purpose of attending a meeting of the Institute of International Finance. *Id.* The Bank did not disclose the purpose of the other meetings that Messrs. Shawa conducted during this five-day trip with "executives and employees from other financial institutions." *Id.*

Amal Massis, the Bank's Head of Operational Risk, traveled to the District of Columbia on October 11-14, 2017. *Id.* She, too, met with unidentified officials of the Institute of International Finance and unidentified "executives and employees from other financial institutions." *Id.* This trip was ostensibly for the purpose of

---

[6] Pursuant to the Discovery Order, Mr. Elsalameen was not permitted to seek discovery into the Bank's interactions with governmental entities or arms of the World Bank, including the IFC, in the District of Columbia. The interactions described herein may not convey the full extent of the Bank's trips to the District of Columbia during the relevant time period.

[7] The IFC developed the risk management program for the Bank, a fact that the Bank advertised repeatedly in its distributions to investors and customers. JA557; JA566; JA576; JA622; JA627; JA633.

attending a meeting at the Institute of International Finance. *Id.* The Bank did not disclose the purpose of the other meetings that Ms. Massis conducted during this four-day trip with "executives and employees from other financial institutions." *Id.*

Raya Sbitany, the Bank's Chief Business Development and Financial Inclusion Officer, traveled to the District of Columbia on October 18-20, 2016. *Id.* She received an award at the Annual Summit of the Global Banking Alliance for Women. *Id.* The Bank did not disclose whether Ms. Sbitany had any other meetings during this three-day trip.

### 6. Emails And Investor Relations List

Since January 1, 2015, the Bank has regularly advertised its services and solicited capital investments through the recurrent distribution of promotional materials to customers, investors, and other business contacts, including contacts with the government and the IFC, via email communications sent to District of Columbia addresses. JA268-69. For this purpose, the Bank has maintained a list of global email addresses known as the "IR List," which stands for "Investor Relations List." *Id.*; *see also* JA659-62 (email communication from the Investor Relations Department notifying recipients of the "IR List" of the Bank's "dynamic Investor Relations website https://bop.ps/en/ir."). No fewer than 83 recipients of the Investor Relations List have addresses in the District of Columbia. JA269. Since 2015, the Bank sent 30 email communications to these District of Columbia recipients,

including employees of the IFC, one of the Bank's major shareholders. JA269; JA553-720.

The Investor Relations List was compiled, maintained, and utilized for the purpose of attracting investors and customers, including in the District of Columbia. JA269-70. The emails sent to recipients of the Investor Relations List included links to the Bank's fiscal reports. JA659-62. These emails also repeatedly touted the Bank's relationship with the IFC, noting specifically that it worked with the IFC to develop a stringent risk management and governance structure—presumably as an inducement for investors to do business with the Bank. JA557; JA566; JA576; JA622; JA627; JA633; JA654; JA682; JA691; JA699. The Bank also announced through its Investor Relations List communications the appointment of IFC employee, Nada Shousha, as an independent board member for the IFC. JA561-62.

**Procedural History**

On October 5, 2016, Mr. Elsalameen initiated this lawsuit by filing a complaint for defamation, conspiracy to defame, invasion of privacy, tortious interference with contract, fraud, civil conspiracy, and intentional infliction of emotional distress against the Bank. He subsequently amended his complaint and seeks, *inter alia*, a declaratory judgment and compensatory damages of at least $5,980,000. JA161-69 ¶¶ 118, 124, 130, 135, 140, 147, 152, 159.

On July 12, 2018, the Bank moved to dismiss the Second Amended Complaint for lack of personal jurisdiction and failure to state a claim. JA8-10; JA11-54.[8] Mr. Elsalameen opposed the Bank's motion to dismiss, arguing, *inter alia*, that personal jurisdiction was proper under D.C.'s long-arm statute, D.C. Code § 13-423(a)(4), based on evidence that the Bank regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from services rendered in the District of Columbia. JA65-68. In the alternative, Mr. Elsalameen cross-moved to take jurisdictional discovery of the extent of the Bank's contacts with the District of Columbia. JA90-92.

On November 27, 2018, the District Court granted Mr. Elsalameen's cross-motion, held the Bank's motion to dismiss in abeyance, and permitted Mr. Elsalameen to take jurisdictional discovery, but only as to four subjects that the District Court considered relevant. JA5-6. Specifically, the District Court limited the scope of jurisdictional discovery to the following:

> 1) whether defendant solicited capital investments from private individuals or entities—***as opposed to any governmental entities or arms of the World Bank, which would not be relevant***—within the District of Columbia; 2) whether it solicited new banking customers within the District of Columbia; 3) whether it operates any branches or offices or employs any individuals in the District of Columbia; and 4) the use of its online website by customers within the District of

[8] The Second Amended Complaint was filed on October 2, 2018, after the Bank filed its motion to dismiss. The parties agreed that the Bank's motion to dismiss would be deemed to apply to the Second Amended Complaint. JA5.

> Columbia to transact any banking business, including, the nature, frequency, and volume of any such use.

*Id.* (emphasis added).

The District Court permitted the parties to file supplemental briefs in support of their respective positions on the Bank's motion to dismiss the Second Amended Complaint. JA171-73; JA728-55.

On September 4, 2019, the District Court granted the Bank's motion to dismiss the Second Amended Complaint after concluding that there was a lack of personal jurisdiction over the Bank. JA879; JA881.

## SUMMARY OF THE ARGUMENT

The District Court dismissed Mr. Elsalameen's Second Amended Complaint with prejudice upon finding that the Bank's contacts with the District of Columbia were too few and sporadic to exercise personal jurisdiction under Subsection (a)(4) of D.C.'s long-arm statute, D.C. Code § 13-423 (permitting jurisdiction over a nonresident defendant, who causes tortious injury in the District by an act or omission outside the District if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenues from services rendered, in the District). The District Court's conclusion was in error and its Dismissal Order should be reversed.

Mr. Elsalameen satisfied his burden of demonstrating that the Bank's numerous, continuing, and deliberate contacts with the District of Columbia are

sufficient to exercise personal jurisdiction over the Bank. The District Court erred in failing to consider the totality of those contacts and whether, in the aggregate, they satisfied the persistent conduct prong of Subsection (a)(4) of D.C.'s long-arm statute. "[T]he most critical inquiry" is whether the defendant's association with the forum is not merely "fortuitous or accidental," but "deliberate and voluntary." *Harris v. Omelon*, 985 A.2d 1103, 1105 (D.C. 2009) (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 995, 997 (D.C. 1981)). Hence, courts must review a defendant's contacts "in the aggregate" to deduce whether that defendant's association with the District of Columbia is deliberate and continuing, or merely fortuitous and sporadic. *Etchebarne-Boudin v. Radice*, 982 A.2d 752, 758 (D.C. 2009). The District Court, therefore, committed reversible error by failing to consider the Bank's contacts in the aggregate.

The District Court also abused its discretion when it ruled in the Discovery Order that Mr. Elsalameen was precluded from conducting jurisdictional discovery into the Bank of Palestine's contacts with the IFC or any governmental entities in the District of Columbia. The Court determined that such contacts were irrelevant under the Government Contacts Exception, which exempts a defendant from assertions of personal jurisdiction in the District based on contacts made during the exercise of the First Amendment right to petition the federal government. *Rose v. Silver*, 394 A.2d 1368, 1372-73 (D.C. 1978). In so doing, the District Court erred

for several reasons. First, the Government Contacts Exception only applies to U.S. citizens, not foreign entities like the Bank. The D.C. Court of Appeals has made clear that the First Amendment right to petition the government provides the "only principled basis" to exclude a defendant's contacts with the District of Columbia. *Rose*, 394 A.2d at 1374. The Bank is not a U.S. citizen and has no First Amendment rights to petition the federal government.

Second, the Bank's contacts were purely commercial and had nothing to do with petitioning the government. Even assuming that the Government Contacts Exception applies to nonresident foreign citizens, it does not apply to commercial contacts, and the Bank's contacts with the IFC (an international organization, not an agency of the federal government) were purely commercial. The Exception is limited to acts that constitute "getting information from or giving information to the government, or getting the government's permission to do something, which can only be done in Washington because that is where the government is." *Investment Co. Institute v. United States*, 550 F. Supp. 1213, 1216-17 (D.D.C. 1982). "In order to come within the government contacts exception, a defendant's only contacts with the District of Columbia must involve uniquely governmental activities." *Morgan v. Richmond Sch. of Health & Tech., Inc.*, 857 F. Supp. 2d 104, 108 (D.D.C. 2012). The Bank's contacts with the District of Columbia are related to raising capital and

serving clients, and have nothing to do with petitioning the federal government, so the Government Contacts Exception does not apply.

Finally, the District Court made several errors in using the financial data produced by the Bank. The District Court relied on an overstated revenue figure derived from the Bank's consolidated financial statements, which included revenue for all of its subsidiaries. In failing to adjust the Bank's revenue figures to exclude subsidiaries, the District Court incorrectly understated the ratio of the Bank's revenue attributable to District of Columbia customers.

The District Court's Dismissal Order and Discovery Order, respectfully, should be reversed. If this Court determines that fact issues remain regarding whether the Bank is subject to personal jurisdiction under D.C.'s long-arm statute, the case should be remanded with instructions to the District Court to allow Mr. Elsalameen to take additional jurisdictional discovery into the Bank's contacts in the District of Columbia with governmental entities and the IFC.

## ARGUMENT

### I. Standard Of Review.

This Court reviews *de novo* a district court's dismissal for lack of personal jurisdiction. *Livnat v. Palestinian Authority*, 851 F.3d 45, 48 (D.C. Cir. 2017). This Court also reviews a district court's discovery rulings under an abuse of discretion standard. *Id.*

## II. The District Court Erred When It Dismissed The Second Amended Complaint For Lack Of Personal Jurisdiction.

A defendant's motion to dismiss for lack of personal jurisdiction must be denied if the plaintiff makes a *prima facie* showing of jurisdiction. *GTE New Media Servs., Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000). All factual discrepancies must be resolved in the plaintiff's favor. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). In determining personal jurisdiction, a court may consider material outside the pleadings, and a plaintiff's allegations establishing the court's jurisdiction may be "bolstered by . . . affidavits and other written materials . . . ." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).

### A. The District Court Has Specific Jurisdiction Under D.C.'s Long-Arm Statute.

The District Court has specific personal jurisdiction over the Bank pursuant to D.C.'s long-arm statute, which grants personal jurisdiction over a person, *inter alia*, "causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, ***or*** derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4) (emphasis added). Subsection (a)(4)'s "plus factors aid in weeding out cases in which the in-District injury 'is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum.'" *Groop Internet Platform Inc. v.*

*Psychotherapy Action Network*, Slip Op. 19-cv-1854, 2020 WL 353861, at *4 (D.D.C. Jan. 21, 2020) (quoting *Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981) (Ginsburg, J.)). Courts "routinely consider[] the totality of defendants' contacts in assessing the 'plus factors' of subsection (a)(4)." *Lewy v. Southern Poverty Law Center, Inc.*, 723 F. Supp. 2d 116, 126 (D.D.C. 2010) (collecting cases).

In this case it is undisputed that Mr. Elsalameen "suffered a tortious injury in the District of Columbia" and "the injury was caused by the [the Bank's] act or omission outside of the District of Columbia." *Blumenthal v. Drudge*, 992 F. Supp. 44, 53 (D.D.C. 1998) (finding that injury occurred in the District of Columbia where plaintiffs resided there). Mr. Elsalameen alleges that the District of Columbia was the focal point of the Bank's tortious conduct and the situs of where he suffered harm to his reputation and personal safety. *See supra* at 5-6. The Bank's intentional targeting of a forum resident makes it foreseeable that it would have been sued here.

Therefore, Mr. Elsalameen need only show that the Bank "had one of three enumerated contacts with the District of Columbia." *Blumenthal*, 992 F. Supp. at 53. *Id.* Mr. Elsalameen satisfied his burden and, therefore, the District Court's decision should be reversed.[9]

[9] The District Court held that because the Bank's contacts did not create personal jurisdiction under Section (a)(4) of the D.C. long-arm statute, "the exercise of personal jurisdiction would also be improper under the Due Process Clause." JA879.

At the very least, the facts considered by the District Court[10] demonstrate that the Bank regularly does or solicits business and engages in other persistent courses of conduct in the District of Columbia.

The "doing business" plus factor "is satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'- or 'presence'-based jurisdiction." *Trump v. Comm. on Ways and Means, U.S. House of Reps.*, --- F. Supp. 3d ---, 2019 WL 5866752, at *7 (D.D.C. 2019) (quoting *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987)). The Bank's interactive website, standing alone, satisfies the "doing business" plus factor. The D.C. Circuit has held that:

> a website maintained by Ameritrade, [a non-resident defendant], was sufficiently 'interactive' to support ***general jurisdiction*** in the District because the website allowed District residents to '[1] open Ameritrade brokerage accounts online; [2] transmit funds to their accounts electronically . . . [3] use those accounts to buy and sell securities, borrow from Ameritrade on margin, and [ ] pay Ameritrade brokerage commissions and interest.

---

This was legal error because "Section 13-423(a)(4) is '***more*** restrictive than the Due Process Clause of the Constitution.'" *D'Onofrio v. SFX Sports Group, Inc.*, 534 F. Supp. 2d 86, 93 (D.D.C. 2008) (alteration in original) (quoting *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 82 (D.D.C. 2006)). So, where there is jurisdiction under subsection (a)(4), "it follows that there are also sufficient minimum contacts to satisfy due process." *Blumenthal*, 992 F. Supp. at 58.

[10] The District Court erroneously excluded many of the Bank's key contacts with the District of Columbia from its analysis. *See infra* Section II.C. Those excluded contacts further demonstrate that the Bank engaged in a persistent and deliberate course of conduct in the forum.

*FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1092 n.6 (D.C. Cir. 2008) (brackets and ellipses in original) (emphasis added) (quoting *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 512 (D.C. Cir. 2002)). The Bank's interactive website was continuously accessible, and in fact regularly used by, its District of Columbia customers, who over the relevant time period engaged in hundreds of transactions involving tens of millions of dollars, and generated banking fees for the Bank. Revenue passed to the Bank in the form of Net Interest & Commission Revenue gained, but the net interest from District of Columbia accounts was not disclosed. *See supra* at 7-9; *see also* JA761.

The Bank's in-forum contacts go far beyond just its interactive website. The Bank regularly advertised its services to attract new customers and regularly solicited capital investments in the District of Columbia as evidenced by: a two-day fundraising Road Show organized by the Bank's Investor Relations Department;

**PUBLIC COPY – SEALED MATERIAL DELETED**

[redacted] and numerous promotional communications sent via email to at least 83 District of Columbia recipients of the Bank's Investor Relations List, touting the Bank's financial performance and investment opportunities, as well as its close association with the IFC. *See supra* at 10-16.

The Bank's relationship with the IFC is further evidence of the Bank's persistent course of conduct in the District of Columbia. The IFC not only owns a 4.73% equity interest in the Bank with an equivalent percentage of voting rights, one of its employees was appointed as an independent member of the Bank's Board of Directors. *See supra* at 15-16. And, the IFC was involved in developing the Bank's risk management program. *See supra* at 16. Taken in the aggregate, the continuing nature of these numerous in-forum contacts establish that the Bank's "association with [the District of Columbia" is not merely "fortuitous or accidental," but "deliberate and voluntary." *Harris v. Omelon*, 985 A.2d 1103, 1105 (D.C. 2009) (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 995, 997 (D.C. 1981)).

### B. The District Court Erred In Failing To Consider The Totality Of The Bank's Contacts With The District Of Columbia.

The District Court erred in analyzing each of the Bank's contacts with the District of Columbia in a piecemeal fashion, rather than analyzing them in aggregate. The District Court divided the body of the Bank's contacts with the District of Columbia into discrete subsets (or at times one single contact), and dismissed each subset of contacts individually as too "negligible," "few," or "sporadic" to satisfy the D.C. long-arm statute's "plus factors."[11] JA872-79. The District Court should have instead analyzed whether the impact of the totality of the Bank's many contacts established a "persistent course of conduct" in the District of Columbia, or whether it satisfied any of the other "plus factors." D.C. Code § 13-423(a)(4). If it had, it would have concluded that it had personal jurisdiction over the Bank because the Bank's many contacts with the District of Columbia satisfy subsection (a)(4)'s "plus factors."

"Courts have routinely considered the totality of defendants' contacts in assessing the 'plus factors' of subsection (a)(4)." *Lewy*, 723 F. Supp. 2d at 126

---

[11] Under D.C. Code § 13-423(b), the claim for relief does not have to be related to the "plus factors"; it need only arise from the tortious act outside the district that caused an injury within the district. *See, e.g.*, *Trump*, --- F. Supp. 3d ---, 2019 WL 5866752, at *7 (D.D.C. Nov. 11, 2019) (quoting *Crane*, 814 F.2d at 763) ("[S]ubsection (a)(4) contemplates a connection that may be unrelated to the claim in suit."); *FutureGen Co. v. Carter*, 915 F. Supp. 2d 104, 108 (D.D.C. 2013) (quoting *Crane*, 814 F.2d at 763) ("The 'persistent course of conduct under (a)(4) need not be related to the act that caused the injury.'").

(citing *Burman v. Phoenix Worldwide Industries, Inc.*, 437 F. Supp. 2d 142, 153-56 (D.D.C. 2006); *see also, e.g.*, *Blumenthal v. Drudge*, 992 F. Supp. 44, 57 (D.D.C. 1998)). The D.C. Court of Appeals has noted that Subsection (a)(4)'s use of the word "persistent" indicates that the statute is "more concerned with a continuing contact than with the impact or substance of a single contact." *Parsons v. Mains*, 580 A.2d 1329, 1330 (D.C. 1990). "[T]he most critical inquiry" is whether the defendant's association with the forum is not merely "fortuitous or accidental," but "deliberate and voluntary." *Harris*, 985 A.2d at 1105 (quoting *Mouzavires*, 434 A.2d at 995, 997). So, courts often need to review a defendant's contacts "in the aggregate" to deduce whether that defendant's association with the District of Columbia is by choice or by accident. *Etchebarne-Boudin v. Radice*, 982 A.2d 752, 758 (D.C. 2009). For example, in *Richards v. Duke Univ.*, 480 F. Supp. 2d 222 (D.D.C. 2007), the court analyzed whether

> [1] Duke University's recruiting activities . . . , [2] the fact that students from the District of Columbia attend Duke . . . and [3] a small number of adjunct faculty at Duke University live in the District of Columbia . . . ***in the aggregate***, constitute regular business, persistent conduct[,] or receipt of substantial revenue from the District of Columbia as required under the D.C. Code § 13-423(a)(4) to assert personal jurisdiction.

*Id.* at 230 (emphasis added).

Courts consider the totality of a defendant's contacts with the forum because a single type of contact with the forum, analyzed in isolation, will almost always appear to be fortuitous. But when all of a defendant's various contacts are "coupled

with [each other]," a pattern may emerge showing deliberate and voluntary association with the forum. *Blumenthal*, 992 F. Supp. 2d at 57.

Where, as here, the Bank has multiple contacts with the forum, the court's analysis must "concentrate[] on the additional multiple and persistent contacts between the defendant and the forum." *Charlton v. Mond*, 987 A.2d 436, 439 & n.12 (D.C. 2010). Courts must weigh whether the "***combination*** of factors . . . convey[s] personal jurisdiction under D.C.'s long-arm statute." *Simon v. Rep. of Hungary*, 37 F. Supp. 3d 381, 433 (D.D.C. 2014) (alteration in original), *aff'd in part and rev'd in part on other grounds*, 812 F.3d 127 (D.C. Cir. 2016).

In this case, it is clear that the Bank's contacts with the District of Columbia were not isolated, but have been persistent and continuing at least since the Bank allowed the IFC to acquire 4.73% of the equity ownership and an equivalent percentage of voting rights. As discussed below in Section II.C, the District Court erred by precluding Mr. Elsalameen from taking jurisdictional discovery into the Bank's contacts in the District of Columbia with governmental entities and arms of the World Bank, which includes the IFC, and consequently excluding from its analysis many of the Bank's key contacts with the District of Columbia. Those contacts that the District Court did consider are, nonetheless, collectively sufficient to support personal jurisdiction under D.C.'s long-arm statute.

The District Court reached a contrary conclusion by isolating the Bank's contacts and finding that each subset did not, by itself, constitute a persistent course of conduct. The District Court's opinion is divided into five distinct sections—entitled "I. The Customers," "II. The Website," "III. The Emails," "IV. The Business Trips," and "V. The Shareholders"—each of which includes a hermetically-sealed analysis of one category of the Bank's contacts with the District of Columbia. Each of the five analyses are relatively brief, and they make clear that the District Court failed to consider the Bank's contacts in the aggregate.

In Section "II. The Website," for example, the District Court found "no basis to infer that defendant engages in a persistent course of conduct," JA875, in the District of Columbia because "[t]he mere accessibility of a website in the District of Columbia is an insufficient basis for personal jurisdiction," JA873. Describing this contact as "mere" highlights the District Court's myopic approach. Maintaining a passive, non-interactive website that is accessible from D.C. does not, by itself, amount to a "persistent course of conduct" under subsection (a)(4). *Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*, 578 F. Supp. 2d 164, 171 (D.D.C. 2008). However, the Bank's website is only one of many different types of deliberate contacts it has made, and continues to foster, with the District of Columbia. Furthermore, the Bank's website was interactive, continuously accessible, and in fact, regularly used by its District of Columbia customers. Since

January 1, 2015 these customers accessed their accounts online a total of 1,739 times. *See supra* at 8. The interactivity of the Bank's website is a feature recognized by both this Circuit and the D.C. Court of Appeals as strongly supporting a finding of personal jurisdiction.[12] If the District Court had analyzed how the Bank's interactive website was actually used by District of Columbia customers in conjunction with the Bank's other contacts in the District of Columbia, it would have concluded that it had personal jurisdiction under Subsection (a)(4). *See, e.g.*, *Lewy*, 723 F. Supp. 2d at 126 (finding a "persistent course of conduct" where the defendant maintained an interactive website accessible by D.C. residents, sent mail to and received funds from D.C. residents, sent employees to D.C., and collected information from D.C.); *Blumenthal*, 992 F. Supp. at 57 (finding a "persistent course of conduct" where the defendant maintained an interactive website accessible to D.C. residents "coupled with" other contacts).

The District Court repeated its cabined analysis in Section "III. The Emails." It dismissed evidence of the Bank's email communications because "merely '[s]ending emails or making phone calls to District residents does not constitute

---

[12] *See Gorman*, 293 F.3d at 512-13 (emphasis added) (noting that a court might have ***general jurisdiction*** over a defendant based solely on an interactive website that allows customers to open accounts, transmit funds, trade securities, and enter into binding contracts); *Shaheen v. Smith*, 994 F. Supp. 2d 77, 84 (D.D.C. 2013) (quoting *Showell*, 578 F. Supp. 2d at 171) ("[A] website [can] constitute a persistent course of conduct within the District of Columbia, [but] it must meet a certain level of interactivity [with users in the District of Columbia].").

conducting 'regular business' or engaging in a 'persistent course of conduct' in the District of Columbia." JA876 (alteration in original) (quoting *Nuevos Destinos, LLC v. Peck*, No. 15-cv-1846, 2019 WL 78780, at *11 (D.D.C. Jan. 2, 2019)). In *Nuevos*, the case on which this Section of the District Court's analysis relies, the court explained that it was

> unable to identify ***any*** activity or conduct that occurred in the District involving the nine defendants, ***beyond receiving a few emails or phone calls,*** such that the Court could assume that the defendants regularly do business or engage in a persistent course of conduct in the District. Sending emails or making phone calls . . . to plaintiffs located in the District of Columbia '***do not, standing alone***, constitute a persistent course of conduct' pursuant to the long arm statute.'

*Nuevos*, 2019 WL 78780, at *11 (first alteration in original) (footnote omitted) (citations omitted) (quoting *Naegele v. Albers*, 110 F. Supp. 3d 126, 153 (D.D.C. 2015)). The Bank's multiple, continuing and substantial contacts with District of Columbia stand in stark contrast to the contacts (or lack thereof) at issue in *Nuevos* and *Naegele*. The email communications, even standing alone, and certainly in conjunction with the Bank's other contacts, demonstrate that it has engaged in a persistent course conduct. Since January 1, 2015, the Bank sent 30 email communications to 83 email addresses in the District of Columbia from the Investor Relations List compiled, maintained, and utilized for the purpose of soliciting business and capital investment. All of these communications are relevant to whether the Bank engaged in a persistent course of conduct in the District of

Columbia, even communications with government entities and the IFC. *See infra* Section II.C.

Section "IV. The Business Trips" suffered the same flaw. The Bank produced evidence that representatives made four business trips to the District of Columbia during the relevant period. The District Court found that two of the business trips were "irrelevant" because they involved attendance at events hosted by the Institute of International Finance, and dismissed a third trip because it involved attendance at an award ceremony at the Annual Summit of the Global Banking Alliance for Women. JA877-78. The District Court then isolated the remaining business trip—the two-day Investor Relations Road Show event in the District of Columbia—from all of the other evidence and rejected it as insufficient: "But ***this single trip*** hardly constitutes a 'persistent course of conduct.'" JA878 (emphasis added). The District Court should have considered the Road Show event in conjunction with the Bank's numerous other, continuous contacts with the District of Columbia. Those contacts also should have included the other three business trips that the District Court considered irrelevant: the five-day trip on October 4-8, 2016, when the Bank's Chairman and General Manager, as well as its Chief Risk Officer, met with multiple, unidentified "executives and employees from other financial institutions," JA180; the four-day trip on October 11-14, 2017, when the Bank's Head of Operational Risk also met with multiple, unidentified "executives and employees from other financial

institutions"; and the three-day trip October 18-20, 2016, when the Bank's Chief Business Development and Financial Inclusion Officer received an award at the Annual Summit of the Global Banking Alliance for Women. *Id.* The Bank did not disclose the purpose of these other meetings that occurred over the course of many days, but there is a reasonable inference that they were for the purpose of transacting business or soliciting investment, and not solely for the purpose of attending a trade association event or receiving an award. The Bank, like any for-profit enterprise, does not expend the resources to send senior executives abroad without some business purpose. The very fact that other meetings took place concurrently with attendance at other events suggests that these trips were intended, at least in part, to develop business. Any factual dispute over the substance or relevance of these business trips to the jurisdictional analysis should have been resolved in Mr. Elsalameen's favor. *See Crane*, 894 F.2d at 456.

Section "V. The Shareholders" was no different. With respect to the Bank's shareholders who reside in the District of Columbia the District Court found that their "negligible amount [of equity ownership in the Bank] does not show a 'persistent course of conduct' or that the Bank is regularly doing business in D.C." JA879. The District Court, however, did not consider the 4.73% equity interest owned by the IFC, headquartered in the District of Columbia, making it a major shareholder with an equal percentage of voting rights. *See supra* at 10. The D.C.

Circuit has found that the plus factors were satisfied where a defendant's financial footprint in the District of Columbia was much smaller than that of the Bank. In *Founding Church of Scientology of Washington, D.C. v. Verlag*, the D.C. Circuit found Subsection (a)(4)'s plus factors satisfied where the defendant, a New York corporation with annual gross revenues of approximately $2.6 million, derived just 1% of its revenue from District of Columbia contacts. 536 F.2d 429, 432-33. The scope and impact of the Bank's business in the District of Columbia is far greater than that held to be sufficient in *Scientology*. The Bank is a multi-billion dollar corporation, and one of its major shareholders—nearly 5% of its equity—resides in D.C.

In "Section I. The Customers," the District Court analyzed only whether the amount of "Fees Charged" collected from those accounts was sufficient to find either "that defendant regularly does or solicits business in the District of Columbia or derives substantial revenue from banking activities in the District."[13] JA872-73. The District Court, however, did not consider whether the Bank's District of Columbia customers and their account activity satisfied the third plus factor of "engag[ing] in any other persistent course of conduct." D.C. Code § 13-423(a)(4). The Bank's District of Columbia customers and their account activity, including the

[13] The District Court also failed to consider any revenue generated by the Bank from Mr. Elsalameen's initial deposit of $2 million.

amount of revenue generated from that activity, need not be "substantial" in amount to satisfy the persistent conduct plus factor. This third "plus factor" is "more concerned with a continuing contact than with the impact or substance of a single contact." *Parsons*, 580 A.2d at 1330. Even so, the Bank's District of Columbia customers' account activity was in fact substantial. They engaged in hundreds of transactions, involving over $40 million in aggregate value, including $23.1 million in transfers and $7.2 million in withdrawals. They deposited $15.01 million into their accounts, and in aggregate, possessed an average monthly balance of $1,528,449. *See supra* at 8. The District Court should have analyzed the continuing nature of the Bank's contacts with its multiple customers in the District of Columbia, along with the Bank's many other connections to the District of Columbia.

In sum, the District Court erred by failing to consider the totality of the Bank's numerous, deliberate, and persistent contacts with the District of Columbia. The Bank's relationship with this forum is anything but "accidental" or "fortuitous." *Harris*, 985 A.2d at 1105.

### C. The District Court Abused Its Discretion By Denying Jurisdictional Discovery Into, And Then Erred In Failing To Consider In Its Dismissal Order, The Bank's Contacts With Governmental Agencies Or Arms Of The World Bank, Including The IFC.

The District Court precluded Mr. Elsalameen from conducting jurisdictional discovery into the Bank's contacts with "any governmental entities or arms of the World Bank," which includes the IFC, as irrelevant under the Government Contacts

Exception. Consequently, the District Court did not consider any such contacts when it decided that the Bank's contacts with the District of Columbia were not sufficient to satisfy D.C.'s long-arm statute. The Government Contacts Exception, however, does not apply to the Bank. It applies only to U.S. citizens and their activities in petitioning the federal government under the First Amendment. The Bank is not a citizen of the United States with First Amendment rights to petition the federal government. In addition, the Government Contacts Exception does not apply to the Bank's contacts with the IFC (an international organization, not an agency of the federal government) because those contacts were purely commercial.

### 1. The Government Contacts Exception Does Not Apply To A Nonresident Alien's Contacts With The United States Government.

The Government Contacts Exception does not apply to the Bank, a citizen of Palestine, not the United States, and thus does not bar consideration of its contacts with governmental entities in the District of Columbia.

The D.C. Court of Appeals recognizes that the First Amendment entitles "the entire national citizenry" to "unfettered access to federal departments and agencies" located in the District of Columbia. *Rose v. Silver*, 394 A.2d 1368, 1373 (D.C. 1978) (quoting *Envt'l Research International v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc)). Courts, therefore, "exempt[] one from assertions of personal jurisdiction in the District, if the 'sole contact with the District

consists of dealing with a federal instrumentality.'" *Id.* at 1372-73 (quoting *Envt'l Research*, 355 A.2d at 813). Because "the First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia," a defendant's contacts with the forum are only excluded from the jurisdictional analysis when necessary to avoid "violat[ing] the First Amendment." *Rose*, 394 A.2d at 1374. So, a defendant who wishes to exempt certain contacts it has with the District must "show that [it] had a First Amendment right at stake." *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 248 n.8 (D.C. 1990) (citing *Rose*, 394 A.2d at 1374).

In this Circuit, the scope of the Government Contacts Exception had been "unsettled," particularly as to whether it applied to "a nonresident alien's government contacts with the U.S. government." *Akhmetshin v. Browder*, 407 F. Supp. 3d 11, 23 (D.D.C. 2019), *appeal docketed*, No. 19-7129 (D.C. Cir. Oct. 15, 2019). Forty-five years ago, in *Envt'l Research*, the D.C. Court of Appeals suggested that the purpose of the Government Contacts Exception "is two-fold: to preserve the first amendment rights associated with public participation in federal government, and to prevent the District of Columbia from being converted into a 'national judicial forum.'" *Am. Standard, Inc. v. Sanitary Wares Mfg. Corp.*, No. 86-cv-1997, 1987 WL 19224, at *3 (D.D.C. June 30, 1987) (discussing *Envt'l Research*, 355 A.2d at 813). Two years later, however, the D.C. Court of Appeals

clarified that the Government Contacts Exception applies exclusively to contacts implicating United States' citizens' First Amendment right to petition the federal government. *Rose*, 394 A.2d at 1374.

In *Rose*, the D.C. Court of Appeals held that the First Amendment's Petition Clause, which protects the "right of the people . . . to petition the Government for a redress of grievances," U.S. Const., amend. I, provides "the only principled basis" for the Government Contacts Exception. *Id.* Hence, the concern articulated in *Envt'l Research*—preventing the District of Columbia from becoming a national judicial forum—was no longer a reason for excluding a nonresident defendant's contacts with the District of Columbia from the court's jurisdictional analysis. *See id.* Courts, instead, could and should address that concern through a motion to dismiss or to transfer on *forum non conveniens* grounds. *See Skillman*, 579 A.2d at 249 n.10 (explaining that concern that the District of Columbia would become a national judicial forum is only "a proper consideration in determining whether to dismiss on the ground of *forum non conveniens*," and not a basis to exclude a defendant's contacts with the federal government in deciding the issue of personal jurisdiction over a nonresident defendant); *see also Ramamurti v. Rolls-Royce Ltd.*, 454 F. Supp. 407, 411 (D.D.C. 1978) (citing 28 U.S.C. § 1404(a) and D.C. Code § 13-425) ("Although this may mean that a large number of foreign corporations will be subject to suit here, both federal and local law provide adequate mechanisms to insure that

such defendants are not required to litigate in an inconvenient forum."). The *Skillman* court explained that "invocation of the 'government contacts' principle" is only permitted when "the defendants can assert a First Amendment interest stemming from their" putatively exempt government contacts. *Id.* at 249. *But cf. Campanhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1133 n.5 (D.C. 2012) (citations omitted) ("The decision in [*Rose*], including the suggestion that the government contacts doctrine was limited to activities implicating First Amendment rights, generated great controversy. We do not attempt to resolve the uncertainty here.").

The Bank cannot claim any First Amendment basis for invoking the Government Contacts Exception. The Bank is a foreign corporation organized under the laws of Palestine. It is not a "citizen" of the United States, so it may not invoke constitutional rights. *See, e.g.*, *Palestine Info. Office v. Schultz*, 853 F.2d 932, 946 (D.C. Cir. 1988) (Silberman, J., concurring) ("Of course, no foreign government or entity has a First Amendment right to be represented diplomatically in the United States."); *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51, 66 (D.D.C. 2010) (holding that ordinary Fifth Amendment minimum-contacts requirements "do not apply to non-person foreign entities"). Some district courts in the D.C. Circuit have extended the Government Contacts Exception to non-resident aliens, relying on *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d

200, 205 n.11 (D.C. Cir. 1981). *See Akhmetshin*, 407 F. Supp. 3d at 24. But those cases misread *Stabilisierungsfonds*, which did not resolve whether the Government Contacts Exception applied to non-resident aliens. Instead, it found that the non-resident alien defendants had sufficient contacts with the District of Columbia to support exercising personal jurisdiction over them without "rest[ing] any part of [the] decision on the Australians' contacts with federal officers." *Id.* at 205 n.11.

The Supreme Court's guidance is clear that a foreign corporate entity, like the Bank, cannot invoke the First Amendment. *See Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011) (Kavanaugh, J.) (collecting cases), *aff'd*, 565 U.S. 1104 (2012). The Supreme Court "recognize[s] 'a State's power to exclude aliens from participation in its democratic political institutions' as part of the sovereign's ***obligation*** 'to preserve the basic conception of a political community.'" *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) (emphasis added) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647-48 (1973)). "It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in . . . activities of democratic self-government." *Bluman*, 800 F. Supp. 2d at 288. To say that the First Amendment is unconcerned with the rights of foreign entities, such as the Bank, vis-à-vis the federal government does not go far enough. The First Amendment actually requires excluding foreign

entities from participating in United States' democratic processes, like petitioning the federal government.

The concern that animates the Government Contacts Exception—"potentially chilling the 'robust' and 'wide-open' exchange upon which our representative democracy depends"—simply does not apply to a foreign entity like the Bank. *Campanhia*, 35 A.3d at 1133 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Accordingly, the District Court erred by refusing to consider all of the Bank's contacts with the District of Columbia based on the Government Contacts Exception.

**2. The Government Contacts Exception Is Limited To Contacts For The Purpose Of Exercising The First Amendment Right To Petition The United States Government, And Does Not Extend To Commercial Contacts.**

Even assuming that the Government Contacts Exception applies to a foreign company like the Bank, it does not apply to the Bank's contacts with federal government agencies or the IFC that were for commercial purposes. The District Court's blanket prohibition on jurisdictional discovery into such contacts did not recognize any distinction between contacts for First Amendment purposes and those for commercial purposes.

The Government Contacts Exception is limited to acts that constitute "getting information from or giving information to the government, or getting the government's permission to do something, which can only be done in Washington

because that is where the government is." *Investment Co. Institute v. United States*, 550 F. Supp. 1213, 1216-17 (D.D.C. 1982). "In order to come within the government contacts exception, a defendant's only contacts with the District of Columbia must involve ***uniquely governmental activities***." *Morgan v. Richmond Sch. of Health & Tech., Inc.*, 857 F. Supp. 2d 104, 108 (D.D.C. 2012) (emphasis added).

The Government Contacts Exception does not apply to a defendant's contacts with the District of Columbia that "involve substantial commercial relations with the federal government acting in its proprietary capacity." *Ramamurti*, 454 F. Supp. at 411-12 (holding that Rolls-Royce's American subsidiary's contacts with the District of Columbia did not fall within the Government Contacts Exception because "the RRI Washington office is not a legislative, lobbying, or diplomatic office, or one whose contacts with federal agencies touch uniquely governmental functions of the United States").

Similarly, the Government Contacts Exception is inapplicable whenever the defendant's contacts with the District of Columbia stem from it "pursuing a proprietary interest." *World Wide Minerals Ltd. v. Rep. of Kazakhstahn*, 116 F. Supp. 2d 98, 106 (D.D.C. 2000), *aff'd in part, remanded in part*, 296 F.3d 1154 (D.C. Cir. 2002), *cert. denied*, 537 U.S. 1187 (2003). In other words, a defendant's commercial activity in the District of Columbia, as opposed to its pure First

Amendment activities, will not be excluded from a court's jurisdictional analysis. This is true even when those activities arise in the context of facially governmental functions, such as an embassy meeting. *See id.* at 105.

In *World Wide Minerals*, the court acknowledged that a defendant's contacts with embassies in the District of Columbia are typically excluded under the Government Contacts Exception. *See id.* at 105-06. The court nonetheless included the defendant's meeting at the Republic of Kazakhstan Embassy in its jurisdictional analysis because it was not purely diplomatic, but had a partially commercial purpose. *See id.*; *see also, e.g.*, *Dooley v. United Technologies Corp.*, 786 F. Supp. 65, 75 & n.9 (D.D.C. 1992) (holding that the Government Contacts Exception does not apply to meetings with government officials that "involved business – writing memos, making phone calls, having discussions about [business]"), *abrogated on other grounds by FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008).

The only case from this Circuit or any Circuit—other than this case, JA877—to have applied the Government Contacts Exception to a defendant's contacts with the IFC is *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64 (D.D.C. 2004), *abrogated in part on other grounds by Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011). The District Court, however, misapplied *AGS*

in holding that the Government Contacts Exception excluded the Bank's contacts with government agencies and the IFC. JA877.

In *AGS*, the court relied heavily on the outdated notion that the Government Contacts Exception is necessary to prevent the District of Columbia from becoming a nation-wide forum. *See id.* at 79-80, 82. In doing so, the *AGS* court not only failed to acknowledge that the D.C. Court of Appeals later curtailed the Exception, *see Rose*, 394 A.2d at 1374, it also cited almost exclusively to federal courts in New York that analyzed New York's long-arm statute. *See AGS*, 346 F. Supp. 2d at 77, 82. Importantly, *AGS* did not apply the Government Contacts Exception to the one defendant, Minera Yanacocha, in which the IFC had a 5% equity interest, *see id.* at 67, apparently recognizing that the Exception does not apply to a defendant's contacts with the District of Columbia that "involve substantial commercial relations with the federal government acting in its proprietary capacity," *Ramamurti*, 454 F. Supp. at 411-12. Instead, the court analyzed Minera Yanacocha's contacts with the IFC in determining whether it had general personal jurisdiction over the defendant. *See AGS*, 346 F. Supp. 2d at 76-77. The court, concluding there was no general jurisdiction, then applied the Government Contact Exception to one of Minera Yanacocha's co-defendants, Newmont USA. *See id.* at 81-82. The court explained that even though Minera Yanacocha was one of Newmont USA's subsidiaries, "it was Minera Yanacocha that received funds from the IFC, not Newmont USA." *Id.*

at 81. Therefore, "any contacts Newmont USA had with the IFC in connection with Minera Yanacocha falls within the government contacts exception." *Id.* at 82.

In this case, the record that was developed under the restrictions imposed by the District Court's Discovery Order shows that the Bank has maintained numerous, significant, and persistent ***commercial*** contacts with the IFC sufficient to subject the Bank to personal jurisdiction in the District of Columbia under D.C.'s long-arm statute. If the Court determines that fact issues remain, this case should be remanded to the District Court to allow Mr. Elsalameen to take jurisdictional discovery into the Bank's commercial contacts with agencies of the federal government and the IFC.[14] *See infra* Section III.

[14] Permitting such discovery into the Bank's commercial activity with the IFC is consistent with the Supreme Court's recent decision in *Jam v. Int'l Finance Corp.*, 139 S. Ct. 759 (2019), which held that the IFC does not enjoy absolute immunity under the International Organizations Immunity Act of 1945, 22 U.S.C. § 288a(b). *See id.* at 772. Instead, the IFC is afforded only restrictive immunity coextensive with the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, and thus "may be subject to suit in connection with its commercial activity that has a sufficient nexus to the United States." *Id.* at 766. The Supreme Court has thus recognized that international organizations created by treaty, like the IFC, are commercial enterprises and engage in commercial activity capable of sustaining personal jurisdiction.

### 3. The District Court Erred In Not Considering The Commercial Nature Of The Bank's Contacts With The District Of Columbia, Including The IFC's Significant Equity Ownership In The Bank.

In this case, the Bank's connections to and activities within the District of Columbia are substantially, if not purely, commercial in nature. *See supra* at 7-16. The IFC is one of the Bank's major shareholders, owning 4.73% equity interest in the Bank. JA596. Since January 1, 2015, the Bank's District of Columbia customers used the Bank's services to engage in transactions involving over $40 million in aggregate value, including $23.1 million in transfers and $7.2 million in withdrawals. JA189. These customer accounts possessed an average monthly balance of $1,528,449. *Id.* The Bank promotes its services and solicits D.C. customers based on its internet banking capabilities, stating, "[t]hrough internet banking [via the Bank's interactive website], clients are able to control their money and conduct transactions on their accounts around the clock without being restricted to official working hours." *See supra* at 10. Since January 1, 2015, the Bank's District of Columbia customers accessed their accounts online a total of 1,739 times. *See supra* at 8. The Bank also conducted a two-day Investor Relations Road Show in the District of Columbia attended by the Bank's highest-level executives and other senior officers from the Bank's investment branches. *See supra* at 12-15. These contacts had nothing to do with petitioning the federal government. These activities are, at bottom, sales pitches; not First Amendment speech.

### D. The District Court's Evaluation Of The Bank's Revenues Related To In-Forum Contacts Was Flawed.

The District Court made several errors in utilizing the financial data produced by the Bank. First, the District Court relied on an overstated "revenue" figure of $447,572,908 for the Bank, which it derived from the Bank's Consolidated Financial Statements dated December 31, 2017. JA872-73. That figure was overstated because the financial statements included Gross Income and Net Interest & Commission Revenue for all of the Bank's subsidiaries.[15] The District Court should have excluded all revenues attributable to the Bank's subsidiaries. As the District Court rightly noted, a "subsidiary's forum contacts are not ordinarily attributed to the parent entity," unless it acts as an alter ego of which the court has personal jurisdiction. JA879 (citing *Leitner-Wise v. Clark*, No. 18-771, 2018 WL 6787999, at *4 (D.D.C. Dec. 26, 2018)); *see also Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 31 (D.D.C. 2012) (stating that, "[a]s a general rule, one corporation's contacts with a given forum may not be attributed to an affiliated corporation"). It was not fair to exclude the in-forum contacts of the Bank's subsidiaries yet simultaneously include their revenue numbers.

[15] Just one example is the Arab Islamic Bank. According to the Bank's consolidated financial statements, the Arab Islamic Bank had a net profit of $6,400,000 for 2017. JA655. Obviously, its revenue would have been much higher. The release to investors and customers advertised that the operation income for the Arab Islamic Bank was $22,348,349 for 2015 and $26,769,377 for 2016. JA575-78.

As a result, the District Court erred when it used the overstated revenue figure as the denominator in calculating the percentage of the Bank's revenues attributable to its District of Columbia customers. The District Court divided the $6,685 in "Fees Charged" to its District of Columbia customers by $447,572,908, and concluded that the resulting percentage was "an infinitesimal percentage . . . [and] insufficient to support an inference that defendant regularly does and solicits business in the District of Columbia or derives substantial revenue from banking activities in the District." JA873. In not adjusting the consolidated revenue figures to exclude revenue from subsidiaries, the District Court's calculation artificially and erroneously understated the percentage of revenue attributable to the Bank's District of Columbia customers.

Second, the District Court further understated the percentage of revenue attributable to the Bank's District of Columbia customers by incorrectly balancing Net Interest & Commission Revenue against the District of Columbia customers' Fees Charged. The District Court did not explain whether or how the $6,685 in Fees Charged to the District of Columbia customers, JA189, correlates to the $447,572,908 in Net Interest & Commission Revenue purportedly earned by the Bank. JA763. Furthermore, the Bank's calculation of Fees Charged did not include Net Interest as reflected in the Net Interest & Commission Revenue reported in the Bank's 2017 Financial Highlights report. *Id.* In short, the District Court compared

apples to oranges. Because the District Court did not account for any net interest contribution from the District of Columbia customers in its calculations, it understated the revenue numbers attributable to them.

In summary, by not addressing and adjusting the consolidated Gross Income from subsidiaries, and by confusing Net Interest & Commission Revenue with Fees Charged, the District Court underestimated the Bank's contacts with the District of Columbia.

The documents produced by the Bank during jurisdictional discovery did not segregate its revenues from those of its subsidiaries. The Court should remand to permit Mr. Elsalameen to discover revenue information relating solely to the Bank and to allow the District Court to reconsider whether that information satisfies one or more of the D.C. long-arm statutes plus factors.

## III. Any Factual Issues Should Be Resolved Through Jurisdictional Discovery.

The District Court did not identify any factual issues with respect to its decision that specific personal jurisdiction did not exist over the Bank, nor does Mr. Elsalameen believe such issues exist so as to delay the exercise of personal jurisdiction over the Bank. However, if this Court believes that any such issues exist, Mr. Elsalameen requests that the case be remanded to the District Court to allow for additional jurisdictional discovery. Jurisdictional discovery is appropriate "if it could produce facts that would affect [the court's] jurisdictional analysis." *Al*

*Maqaleh v. Hagel*, 738 F.3d 312, 325-26 (D.C. Cir. 2013), *cert. granted in part, judgment vacated in part sub nom. al-Najar v. Carter*, 575 U.S. 908 (2015).

Relying on the District Court's erroneous application of the Government Contacts Exception, the Bank wholesale objected to producing documents or answering interrogatories concerning its contacts with "governmental or quasi-governmental entities in the District of Columbia." JA176; JA266. This objection extended to Mr. Elsalameen's requests for documents and information constituting or concerning the Bank's contracts with such entities and the IFC, especially any contracts containing a District of Columbia choice of venue provision. JA271. It also extended to the Bank's interactions such entities and the IFC at or through meetings, events, banking transactions, other business transactions, distribution of materials soliciting business or capital investment, and records of capital investment. JA178; JA181; JA183; JA267; JA270-73.

For the reasons state above in Section II.C, Mr. Elsalameen is entitled to jurisdictional discovery as to all of these subjects to establish that the Bank is subject to personal jurisdiction under D.C.'s long-arm statute. For example, the nature, frequency, and contracting documents evidencing the Bank's meetings and other interactions with the IFC that led to its acquisition of a 4.73% equity interest, the appointment of an IFC employee as an independent member of the Bank's Board of Directors, and its role in developing the Bank's risk management program are all

highly relevant to showing that the Bank engaged in a persistent course of conduct in the District of Columbia from which it fairly could have expected to be hauled into court here.

## CONCLUSION

For the reasons set forth above, Mr. Elsalameen respectfully requests that this Court vacate the Dismissal Order and the Discovery Order, and remand this case to the District Court for further proceedings.

Dated: May 6, 2020

Respectfully submitted,

/s/ William D. Blakely

William D. Blakely
WILLIAM BLAKELY LAW
P.O. Box 271
Great Falls, VA 22066
Telephone: (202) 285-2728
wblakely@williamblakelylaw.com

Cathy A. Hinger
WOMBLE BOND DICKINSON (US) LLP
1200 Nineteenth Street, Suite 500
Washington, DC 20036
Telephone: (202) 857-4489
cathy.hinger@wbd-us.com

*Counsel for Appellant*
*Fadi Elsalameen*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,622 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: May 6, 2020

/s/ William D. Blakely

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2020, I caused two copies of the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit pursuant to Circuit Rule 47.1(d)(1) and the Court's April 1, 2020, Standing Order No. 20-2, *In re: Paper Copies of Electronic Filings in Light of the COVID-19 Pandemic*. The copies are identical except for references to sealed materials; one bears the legend "Under Seal" and was filed by emailing the document as a PDF to SealedFilings@cadc.uscourts.gov pursuant to Standing Order No. 20-2, and the other copy bears the legend "Public Copy—Sealed Materials Deleted," and was filed via the Court's CM/ECF System. I certify that, with permission of Appellee's counsel, I caused Appellee to be served with electronic copies of the public brief and the brief under seal, in lieu of serving two paper copies pursuant to Circuit Rule 47.1(d)(2).

/s/ William D. Blakely